IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRCT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| ROBERT HOUSER, *et al.*, | ) | CASE NO.  1:21-CV-00915-CAB |
| | ) | |
| Plaintiffs, | ) | |
| | ) | JUDGE CHRISTOPHER A. BOYKO |
| vs. | ) | |
| | ) | MAGISTRATE JUDGE |
| POWERDOT, INC., *et al.*, | ) | JONATHAN D. GREENBERG |
| | ) | |
| Defendants. | ) | **REPORT & RECOMMENDATION** |

This matter has been referred to the undersigned for a Report and Recommendation concerning Defendant's Motion for Return of Property and Motion for Sanctions (Doc. No. 38).  (Doc. No. 39.)  For the following reasons, the undersigned recommends the Motion for Return of Property and Sanctions be GRANTED IN PART and DENIED IN PART.

## I.    FACTS

On July 14, 2020, Plaintiff Robert Houser entered into an Employment Agreement ("Employment Agreement") with Defendant PowerDot, which incorporated a Proprietary Information and Inventions Agreement ("PIIA").  (Doc. No. 54 at 1.)

During his tenure at PowerDot, Houser worked as President of Healthcare, the second-highest ranking officer and highest-paid executive, pursuant to the Employment Agreement until March 29, 2021.  (*Id.*)

During Houser's employment with PowerDot, PowerDot's offices were located in California.  (*Id.* at 2.)  Houser never had a personal PowerDot office in California; during the entirety of his employment, Houser worked remotely.  (*Id.*)  PowerDot assigned Houser a company email address, bob@powerdot.com, which he accessed using his personal device(s).  (*Id.*)

1

On March 29, 2021, PowerDot sent Houser a letter stating, "[T]he Company has terminated your employment with Cause." (*Id.*)  "Cause" was a defined term in the Employment Agreement.  (*Id.*)

On April 15, 2021, Defendant and Counter-Claimant Therabody, Inc. acquired PowerDot.  (*Id.* at 1.)  Attorney Jonathan Muenkel, who was involved in the acquisition, testified that the privilege held by PowerDot was "maintained and transferred over to the acquirers of the supported assets."  (Doc. No. 64 at 140.)  Deputy General Counsel for Therabody, Christina Moncrief, testified Therabody acquired everything PowerDot owned through a stock sale.  (*Id.* at 160.)  Moncrief further testified it was her understanding that as part of the acquisition or merger, Therabody acquired all the rights of PowerDot, including its attorney-client privilege.  (*Id.*)

Following the merger, PowerDot became a subsidiary under the parent entity Therabody, Inc, and PowerDot was subsequently dissolved.  (*Id.*)

As of March 29, 2021, Houser possessed four PowerDot MT prototype pucks ("pucks") and an iPad that PowerDot had acquired for the purpose of controlling and working the prototype devices.  (Doc. No. 54 at 2.)  At some point, Houser turned over possession of the pucks and the iPad ("the hardware") to his legal counsel at Cohen Rosenthal & Kramer LLP.  (*Id.*)

After March 29, 2021, Houser retained emails that were sent and/or received by his bob@powerdot.com email address during his employment with PowerDot.  (*Id.*)

At some point, Houser provided his counsel with copies or data of email messages that were sent and/or received by his bob@powerdot.com email address during his employment with PowerDot, including emails sent and/or received from Jonathan Muenkel.  (*Id.*)

Houser admitted to forwarding emails that had his PowerDot email address from his personal Gmail address to his legal counsel at Cohen Rosenthal & Kramer LLP more than ten times.  (Doc. No. 64 at 46.)  Houser admitted it was possible the emails he forwarded to counsel from his personal Gmail

address contained attorney-client privileged communications he had with PowerDot lawyers. (*Id.* at 52.) Attorney Rosenthal admitted to reviewing emails sent by Houser that originated from his PowerDot email account, although he did not "recall specifically any one as I sit here today." (*Id.* at 97-98.)

At some point, Houser discovered emails he had received at his bob@powerdot.com email address in his Outlook inbox on a computer in Hilton Head. (*Id.* at 30.) The Outlook inbox had been shut off, so he could not forward the emails or do anything else with the email account, and he had to research how to put the information on a hard drive to give to counsel. (*Id.*) Houser turned this information over to counsel in October of last year. (*Id.*)

Houser testified he did not think the contents of his email inbox was covered by the PIIA. (*Id.* at 64.)

On October 31, 2022, counsel for Houser produced documents sent to or received from the bob@powerdot.com email address to Defendants in discovery in response to Defendant's First Set of Requests for Production. (Doc. No. 54 at 3.) Attorney Rosenthal testified that he did not, nor did anyone at the firm, review the contents of the inbox prior to producing it to Defendants. (Doc. No. 64 at 130.) Counsel decided to produce the inbox in its entirety to Defendants in response to document requests served on Plaintiffs. (*Id.* at 128.) Counsel found a contractor who could produce the material in PDF format so the material could be Bates stamped. (*Id.* at 129.) Counsel had the contractor agree to "strict confidentiality and non-disclosure" and had him sign an undertaking from the stipulated protective order in this case. (*Id.*) Counsel had the material Bates stamped in-house before producing the information to Defendants. (*Id.*) Included in this production were emails from Houser's personal email account to legal counsel. (*Id.* at 132.) Attorney Rosenthal testified he was unsure how that happened, but thought they were inadvertently produced since "we weren't carefully reviewing the production." (*Id.*)

On January 9, 2023, Defendants filed a "Privilege Log from Robert Houser Production" (Doc. No. 41). (Doc. No. 54 at 3.) Each entry on Defendants' Privilege Log references a communication as to which Bob Houser was either the author, a direct recipient, or a forwarded recipient. (*Id.*) Each entry on Defendants' Privilege Log references a communication that was sent or received by Houser in the scope and course of his employment with PowerDot. (*Id.*)

## II.     ANALYSIS

In the pending motion for Return of Property and Sanctions, Defendants seek an order for the immediate return of their property, namely the hardware and the emails generated in the course of Houser's employment with PowerDot, which include correspondence protected by PowerDot's attorney-client and attorney work product privileges, pursuant to Ohio's replevin statute. (Doc. No. 38 at 1.) Defendants also seek sanctions under the Court's inherent authority, specifically dismissal of the claim or, in the alternative, disqualification of counsel for "knowingly retaining and disclosing privileged information as well as precluding all unlawfully retained privileged evidence," in addition to any other sanctions this Court deems appropriate. (*Id.* at 1, 5.) Defendants request an award of attorney fees "resulting from the sanctionable conduct of Plaintiffs and their counsel, including but not limited to requesting that they promptly return the Power Dot Property and making this motion for its return." (*Id.* at 13.)

In response, Plaintiffs assert that Houser and counsel's conduct "was at all times in good faith and reasonable under the circumstances." (Doc. No. 43 at 1.) In their post-hearing brief, Plaintiffs assert Defendants have failed to meet their burden to establish relief under both the Court's inherent authority

4

and Ohio's replevin statute.[1]  (Doc. No. 69 at 1.)  Plaintiffs also challenge Defendant Therabody's standing to assert the privilege.[2]  (Doc. No. 43 at 7.)

The Sixth Circuit has explained a district court's inherent powers to sanction a party as follows:

> A district court has the inherent power to sanction a party when that party exhibits bad faith. *Chambers v. NASCO, Inc.*, 501 U.S. 32, 43–50, 111 S.Ct. 2123, 115 L.Ed.2d 27 (1991). The "imposition of inherent power sanctions requires a finding of bad faith," *First Bank of Marietta v. Hartford Underwriters Ins. Co.*, 307 F.3d 501, 517 (6th Cir. 2002), or conduct "tantamount to bad faith," *Roadway Express, Inc. v. Piper*, 447 U.S. 752, 767, 100 S.Ct. 2455, 65 L.Ed.2d 488 (1980). A district court's reliance upon its inherent authority to sanction derives from its power to impose respect in its presence, control the litigants before it, and guarantee the integrity of the courts. *See Chambers*, 501 U.S. at 43–44, 111 S.Ct. 2123. Due to "their very potency, inherent powers must be exercised with restraint and discretion." *Id.* at 44, 111 S.Ct. 2123 (citing *Roadway Express*, 447 U.S. at 764, 100 S.Ct. 2455). "A primary aspect of that discretion is the ability to fashion an appropriate sanction for conduct which abuses the judicial process." *Id.* at 44–45, 111 S.Ct. 2123. As the Supreme Court observed in *Roadway Express*, "outright dismissal of a lawsuit, which [the Supreme Court] had upheld in *Link* [*v. Wabash R.R. Co.*, 370 U.S. 626, 82 S.Ct. 1386, 8 L.Ed.2d 734 (1962)], is a particularly sever [sic] sanction, yet is within the court's discretion." *Chambers*, 501 U.S. at 45, 111 S.Ct. 2123 (citation omitted).

*Bradley J. Delp Revocable Trust v. MSJMR 2008 Irrevocable Trust*, 665 F. App'x 514, 520 (6th Cir. 2016).  "'For a plaintiff's actions to be motivated by bad faith, willfulness, or fault, his conduct must display either an intent to thwart judicial proceedings or a reckless disregard for the effect of [his] conduct on those proceedings.'"  *Id.* at 521-22 (quoting *Wu v. T.W. Wang, Inc.*, 420 F.3d 641, 643 (6th Cir. 2005)) (additional citations omitted).

---

[1] Plaintiffs argue the replevin statute is inapplicable to intangible property such as emails.  (Doc. No. 43 at 11.)

[2] First, PowerDot and Therabody are both defendants in this case, and the motion papers relating to the motion for return of property and sanctions were filed on behalf of both parties.  (Doc. Nos. 38, 41, 44.)  The Second Amended Complaint states Therabody is the successor in interest of PowerDot, which Defendants admitted.  (Doc. No. 30 at 4; Doc. No. 44 at 11.)  In addition, testimony at the hearing established Therabody acquired the privilege through the stock sale and merger, and that PowerDot was subsequently dissolved.  Therefore, to the extent this is a judiciable issue for the limited purpose of resolving the motion for return of property and sanctions before the undersigned, the Court finds Therabody has standing to assert the privilege.

## A. The Hardware

Defendants seek return of the hardware and maintain that "Counsel for Houser has admitted that the tangible objects belong to Houser's former employer."  (Doc. No. 38 at 9.)  However, Plaintiffs maintain that they dispute the ownership of the pucks and that the pucks and the iPad "contain or relate to NeuroBridge intellectual property which does not belong to PowerDot."  (Doc. No. 43 at 1-2.)  Plaintiffs assert they have offered to negotiate a protocol to preserve the evidence contained on the hardware for the past 18 months, "which requests the Defendants have consistently ignored."  (*Id.* at 1.)  Plaintiffs maintain that whether the pucks and the data on the iPad are the property of PowerDot "is an ultimate issue in this lawsuit."  (*Id.* at 6.)  In reply, Defendants assert that Plaintiffs ignore Judge Boyko's prior order dismissing all of NeuroBridge's intellectual property claims without leave to amend, based on Houser's employment agreement with PowerDot.  (Doc. No. 44 at 18-19.)

Limited evidence regarding the hardware was presented at the hearing, as the parties initially represented to the Court that they had a stipulation concerning the hardware and the hearing would proceed on the issues of the emails and sanctions.[3]  (Doc. No. 64.)  However, at the hearing, attorney Rosenthal again disputed the ownership of the hardware.  (*Id.* at 109-10.)  At the end of the hearing, attorney Bristol asked the undersigned for an extension of time to respond to Defendants' pending motion for partial summary judgment because it involved the same issues.  (*Id.* at 180.)  In post-hearing briefing, Plaintiffs argue that "[t]he record demonstrates the pucks were created during Bob Houser's work with Neurobridge *prior* to his execution of his Employment Agreement and the PIIA, and months prior to Houser's employment with PowerDot."  (Doc. No. 69 at 6) (emphasis in original) (citations omitted).

---

[3] The parties later withdrew the stipulation because they could not agree to whether the stipulation resolved the sanctions issue as to the hardware.  However, their proposed stipulations were nearly identical as to how to handle the hardware itself.  (Doc. Nos. 61-62, 68.)

Given the parties' representations regarding the significance of the intellectual property issue and the centrality of the ownership of the pucks and any intellectual property on the iPad to this case, in addition to the fact that the same issues currently are before Judge Boyko on summary judgment and the parties dispute the scope of Judge Boyko's prior order, the undersigned declines to determine who owns the hardware and/or the intellectual property contained in it in resolving this motion.  However, since the parties agreed to a protocol to handle the hardware before withdrawing their stipulation because of a disagreement over the impact on the pending motion for sanctions, the undersigned recommends the Court adopt the parties' earlier proposal regarding the hardware as follows.

The iPad shall be turned over to Vestige Digital Imaging ("Vestige").[4]  Vestige shall forensically image the iPad and the accompanying software and data maintained on the iPad.  The parties shall approve the Vestige imaging protocol prior to imaging.  Vestige shall produce a forensically sound image of the iPad and its contents and produce it in a manner that is capable of *in camera* review by the Court.  Vestige shall maintain a forensically sound copy of the image.  Vestige shall maintain and produce a chain of custody documenting all efforts.  The parties shall share the cost of such imaging and production.  The Court will conduct an *in camera* review of the forensic image to determine what, if any, access Plaintiffs will have to the forensic image.

The parties shall divide the four pucks evenly amongst themselves.  The parties agree to preserve the pucks for use in these proceedings and not for any other purpose.  Any imaging or inspection of the pucks shall be performed to forensic standards.

---

[4] The parties agreed on Vestige as the vendor to be used for the forensic imaging.  (Doc. Nos. 61-62.)

Given the disputed ownership of the hardware, as well as the attempted negotiations regarding the forensic imaging of the hardware by Plaintiffs' counsel, the undersigned recommends the Court find no sanctionable conduct by Plaintiffs' counsel as it relates to the hardware.[5]

## B.  The Emails

Two sets of emails are at the crux of this dispute: (1) the smaller set of emails that originated from Houser's bob@powerdot.com email address and that Houser forwarded to his counsel in this case from his personal Gmail account and (2) the larger number of emails from the Outlook inbox produced to Defendants in its entirety.

The emails involved in this dispute were either sent to or by Houser during his employment at PowerDot.  (Doc. No. 54 at 2.)  Houser testified he forwarded emails to himself on occasion based on the advice of prior counsel, to print documents on his home computer when he was having issues with his remote setup, for obtaining personal legal advice, and in conjunction with ongoing PowerDot projects. (Doc. No. 64 at 31, 39, 40, 43-44.)

As to the first set of emails, Houser provided his counsel with copies or data of email messages that were sent and/or received by his bob@powerdot.com email address during his employment with PowerDot, including emails sent and/or received from Jonathan Muenkel.  (Doc. No. 54 at 2.)  Houser admitted to forwarding emails that had his PowerDot email address from his personal Gmail address to his legal counsel at Cohen Rosenthal & Kramer LLP more than ten times, and that it was possible the emails he forwarded to counsel from his personal Gmail address contained attorney-client privileged communications he had with PowerDot lawyers.  (Doc. No. 64 at 46, 52.)  While Houser forwarded emails to his personal email account on the date of his termination, he did not know he was going to be

---

[5] The Court notes that Plaintiffs failed to request sanctions for Defendants' conduct relating to the attempted negotiations regarding imaging of the hardware; rather, Plaintiffs assert that Defendants have "unclean hands" because of their failure to comply with the local rules of this Court, and the Court should deny the motion on that basis alone.  (Doc. No. 69 at 5-6.)

terminated that day, although he could not recall the timing of whether he had received the termination letter before or after he forwarded those emails. (*Id.* at 41.)

Attorney Rosenthal admitted to reviewing the emails Houser forwarded to counsel but could not remember the substance of them during the hearing.[6] (*Id.* at 97-98.) Although Plaintiffs argue this set of emails is "not the basis of Defendants' pending motion and are beyond the scope of the dispute" (Doc. No. 69 at 3), the Court does not read the Defendants' motion so narrowly and finds this set of emails to be included in the current dispute.

As to the second set of emails, attorney Rosenthal testified that he did not, nor did anyone at the firm, review the contents of the inbox prior to producing it to Defendants. (Doc. No. 64 at 130.) Counsel decided to produce the inbox in its entirety to Defendants in response to document requests served on Plaintiffs. (*Id.* at 128.) Counsel found a contractor who could produce the material in PDF format so the material could be Bates stamped. (*Id.* at 129.) Counsel had the contractor agree to "strict confidentiality and non-disclosure" and had him sign an undertaking from the stipulated Protective Order in this case. (*Id.*) Counsel had the material Bates stamped in-house before producing the information to Defendants. (*Id.*) Included in this production were emails from Houser's personal email account to his legal counsel in this case. (*Id.* at 132.) Attorney Rosenthal testified he was unsure how that happened, but thought they were inadvertently produced since "we weren't carefully reviewing the production." (*Id.*)

As Plaintiffs point out, Defendants failed to provide any unredacted copies of the purportedly privileged emails for *in camera* review by the Court, and therefore Defendants have failed to prove that any of the emails at issue are privileged. The Court agrees.

---

[6] As discussed in more detail below, there is no evidence the forwarded emails were labeled as privileged, any privilege could only be determined after reading them, and attorney Rosenthal testified that he did not determine any of those emails were privileged and he did not return or destroy them after reading them. (Doc. No. 64 at 118.) There is no evidence that counsel reviewed or accessed the forwarded information after being notified of Defendants' assertion of privilege.

Assuming, *arguendo*, that at least some of the emails in the first and second sets at issue here were privileged, the undersigned finds that the conduct of Plaintiffs' counsel fails to rise to the level of bad faith as defined by the law in this circuit, and therefore recommends the Court find that sanctions pursuant to the Court's inherent authority are inappropriate in this case.

### 1.  Dismissal

The behavior by Houser and Plaintiffs' counsel in this case is a far cry from the cases where courts found dismissal to be an appropriate sanction under the Court's inherent authority.

For example, in *Bradley J. Delp Revocable Trust*, Defendants asserted that Bradley, a plaintiff in the case, had stolen documents containing Defendants' attorney-client communications, defense counsel's legal analyses and memoranda, "and detailed conference call agendas of attorney calls pertaining to this action."  665 F. App'x at 516.  Bradley refused to answer any questions during his deposition as to "the amount of privileged and other materials in his possession, the scope of the materials he reviewed, how he obtained the privileged and confidential materials, and whether he still had access to those materials."  *Id.* at 517.  Bradley asserted his Fifth Amendment right against self-incrimination over 70 times during the deposition.  *Id.*  The district court held a three-day evidentiary hearing, and the Sixth Circuit noted several discrepancies between an affidavit Bradley submitted and the testimony at the hearing.  *Id.*  While Bradley attested in his affidavit that he found certain documents in a company conference room, a long-time company employee testified that the company had a protocol for keeping track of and removing documents left in conference rooms, including morning and evening reviews of all conference rooms and room inspections after each meeting.  *Id.* at 517-18.  Bradley attested in his affidavit that he entered an employee's office, gained access to that employee's email inbox without entering a password, and printed every email that he viewed.  *Id.* at 518.  However, the company's network administrator testified that all computers require a password to log in and users are automatically logged out after ten to fifteen minutes

10

of inactivity, and once logged out, after moving the mouse to reactivate the computer, the user would be prompted to enter the password.  *Id.*  In addition, while Bradley did not have authorized access to the company's building after June 10, 2011, and attested he never accessed the building after July 17, 2011 during non-business hours, a night-time cleaning service employee testified that she saw Bradley entering the building after hours on November 12, 2012.  *Id.* at 519.

The district court dismissed Plaintiff's second amended complaint with prejudice as a sanction pursuant to its inherent authority, determining "that only dismissal with prejudice would properly address the knowledge Bradley gained from the incursions, punish him for his theft and attempted cover-up, protect the integrity of the judicial process, and deter others from committing similar offenses."  *Id.*  On appeal, the Sixth Circuit held that the district court did not abuse its discretion in dismissing the second amended complaint with prejudice.  *Id.* at 524.

In *Jackson v. Microsoft Corp.*, 211 F.R.D. 423 (W.D. Wash. 2002), Jackson either stole or purchased two CDs containing over 10,000 email messages that originated in a file on the computer of Jackson's supervisor and were obtained and created without the permission of Jackson's supervisor or Microsoft.  *Id.* at 425-26.  These emails contained "significant amounts of privileged and other sensitive information."  *Id.* at 426.  Jackson also possessed email documents that appeared to be from a different source than the CDs which had been partially destroyed by Jackson so as to remove any information that would identify who printed the email from electronic format.  *Id.*  In addition, Jackson possessed personnel records related to numerous Microsoft employees.  *Id.* at 427.  During his deposition, Jackson gave inconsistent answers as to how he obtained the CDs.  *Id.*  Jackson admitted to distributing the content of the CDs to others and talking about the contents of the CDs with a co-plaintiff.  *Id.*  The district court found Jackson's declaration testimony untruthful, and that Jackson "went to great lengths in his declaration to convince the Court that he was unaware of the highly sensitive materials contained on the

11

CDs." *Id.* at 428.    Jackson invoked his Fifth Amendment right against self-incrimination during the evidentiary hearings in this case, although the court overruled Jackson's assertion of the privilege during the first evidentiary hearing as not properly asserted.  *Id.* at 433.  The court held that Jackson had "unlawfully obtained proprietary materials from Microsoft and has perpetrated a lengthy series of elaborate misrepresentations and lies to both the Court and counsel." *Id.* at 425.  The court determined dismissal of the case was "the only appropriate remedy." *Id.*

### 2.  Disqualification

Defendants fail to cite any precedent regarding the disqualification of counsel as a sanction pursuant to the Court's inherent powers.  Nor do Defendants cite any case law at all regarding disqualification of counsel for violations of Ohio Rule of Professional Conduct 4.4 or Federal Rule of Civil Procedure 26(b)(5)(B).  Indeed, the only binding disqualification case cited by Defendants to the Court involved disqualification because of a conflict of interest resulting from two instances of a past attorney-client relationship between the plaintiff and defense counsel, which is not the issue here. *Bowers v. Ophthalmology Group*, 733 F.3d 647 (6th Cir. 2013).[7]

It is part of a court's duty to safeguard the sacrosanct privacy of the attorney-client relationship. *See American Can Co. v. Citrus Feed Co*., 436 F.2d 1125, 1128 (5th Cir. 1971).  In doing so, a court helps to maintain public confidence in the legal profession and assists in protecting the integrity of the judicial proceeding. *United States v. Agosto*, 675 F.2d 965, 969 (8th Cir. 1982).  Disqualification of counsel is but one of several avenues available to a court in its attempt to ensure that the Rules of Professional Responsibility are not violated.  "The Court retains inherent authority to police the ethical conduct of the

---

[7] In *Kleinfeld v. Huntington Nat'l Bank*, 2008-Ohio-6486, 2008 WL 5182703, at *6 (Ohio Ct. App. Dec. 11, 2008), also cited by Defendants, one of the appellant's assignments of error involved the trial court's failure to disqualify counsel for a conflict of interest and because appellant planned to call the attorneys involved as witnesses in her case, but the state appellate court held that its disposition of appellant's previous assignments of error rendered that argument moot.

lawyers who appear before it and to uphold the ethical norms embodied in the Code of Professional Conduct." *United States v. Miller*, 624 F.2d 1198, 1201 (3rd Cir. 1980). When considering whether to disqualify counsel, "courts must be sensitive to the competing public interests of requiring professional conduct by an attorney and of permitting a party to retain the counsel of his choice." *Hamrick v. Union Twp., Ohio,* 81 F. Supp. 2d 876, 878 (S.D. Ohio 2000).

Because "disqualification is a drastic measure ... a violation of the Code of Professional Responsibility alone should not result in a disqualification, unless disqualification is found to be absolutely necessary." *Centimark Corp. v. Brown Sprinkler Serv., Inc.,* 620 N.E.2d 134, 136-37 (Ohio Ct. App. 1993); *accord Cliffs Sales Co. v. Am. S.S. Co.,* No. 1:07-CV-485, 2007 WL 2907323, at *2 (N.D. Ohio Oct. 4, 2007) ("a violation of the rules of professional responsibility does not automatically necessitate disqualification of an attorney"). Disqualification is appropriate "only when there is a 'reasonable possibility that some specifically identifiable impropriety' actually occurred and, in light of the interest underlying the standards of ethics, the social need for ethical practice outweighs the party's right to counsel of his own choice." *Kitchen v. Aristech Chemical,* 769 F. Supp. 254, 257 (S.D. Ohio 1991).

Other federal courts have used a six-factor test to evaluate whether disqualification is warranted where an attorney inadvertently received privileged information from opposing counsel.  *See, e.g., Simmions v. Pierless Fish Corp.*, 592 F. Supp. 3d 68 (E.D.N.Y. 2020); *Maldonado v. New Jersey*, 225 F.R.D. 120 (D.N.J. 2004); *Richards v. Jain*, 168 F. Supp. 2d 1195 (W.D. Wash. 2001).

The six factors to be considered are:

(1) Whether the attorney knew or should have known that the material was privileged.

(2) The promptness with which the attorney notifies the opposing side that he or she has received its privileged information.

(3) The extent to which the attorney reviews and digests the privileged information.

(4) The significance of the privileged information; *i.e.*, the extent to which its disclosure may prejudice the movant's claim or defense, and the extent to which return of the documents will mitigate that prejudice.

(5) The extent to which [the] movant may be at fault for the unauthorized disclosure.

(6) The extent to which the non-movant will suffer prejudice from the disqualification of his or her attorney.

*Richards*, 168 F. Supp. 2d at 1205.

At the conclusion of the evidentiary hearing, the undersigned directed the parties to address these six factors in their post-hearing briefing.[8]  Like the court in *Richards*, the undersigned finds these factors to be helpful in evaluating the motion to disqualify given the facts of this case.  *Id.*  Again, Defendants failed to provide any unredacted copies of the purportedly privileged emails for *in camera* review by the Court, and therefore Defendants have failed to prove that any of the emails at issue are privileged. Assuming, *arguendo*, that at least some of the emails at issue here were privileged, the undersigned finds as follows for each of the six factors.

### a) Knowledge of the Privileged Material

There is no evidence that Houser's counsel knew at the time they received the forwarded emails that these emails contained privileged information or that counsel should have known that fact before reading them, unlike the case in *Richards*, where many of the documents "were clearly marked 'Privileged,' 'Confidential,' or 'Attorney-Client Privileged.'"  *Id.*  In fact, attorney Rosenthal testified there was no way to determine whether the forwarded emails were privileged until after reading them. (Doc. No. 64 at 118.)  Furthermore, attorney Rosenthal testified that the Outlook inbox was produced in its entirety without review.  (*Id.* at 130.)

### b) Notification of Access to Privileged Material

---

[8] The undersigned notes neither party cited the line of cases utilizing this six-factor test in their post-hearing briefs.  (Doc. Nos. 69-70.)

It is true Houser's counsel did not notify defense counsel of the underlying PowerDot emails forwarded from Houser's personal email account to his counsel, and defense counsel only became aware of these emails after privileged communications between Houser and his counsel were inadvertently produced when Plaintiffs produced the contents of Houser's Outlook inbox to Defendants in its entirety. (Doc. No. 64 at 53, 112, 132.) However, again, there is no evidence the forwarded emails were labeled as privileged, any privilege could only be determined after reading them, and attorney Rosenthal testified that he did not determine any of those emails were privileged and he did not return or destroy them after reading them. (*Id.* at 118.) There is no evidence that counsel reviewed or accessed the forwarded information after being notified of Defendants' assertion of privilege, and attorney Rosenthal testified he could not recall the contents of those emails as of the time he testified. (*Id.* at 97-98.)

Furthermore, in an ironic turn of events, during the hearing Defendants sought to use as exhibits the privileged communications between Houser and his counsel that had been inadvertently produced. (*Id.* at 53, 112.) Plaintiffs' counsel objected to the use of the exhibit, as the inadvertently produced emails were to be sequestered and not used pursuant to local rule. (*Id.*) Defense counsel argued that the "to" and "from" information was not privileged, and all other information had been redacted. (*Id.* at 54.) When the Court asked defense counsel whether the email was supposed to have been sequestered, defense counsel stated, "I have no – I have no such understanding of it. I have never reviewed the substance, only the 'to' and the 'from.'" (*Id.*) Plaintiffs' counsel responded that Rules 26 and 502, as well as the local rules, direct how inadvertently produced emails are to be handled, and they are to be sequestered or destroyed, not used. (*Id.*) When the Court asked co-counsel for the Defendants if that was correct, co-counsel responded that when he discovered the inadvertently produced emails, he called Plaintiffs' counsel and defense counsel agreed to quarantine them. (*Id.* at 54-55.) Co-counsel had a paralegal not involved in this case separate them from the production and created a privilege log for those documents. (*Id.* at 55.)

Counsel did not examine the contents.  (*Id.*)  The Court sustained the objection.[9]  (*Id.* at 55, 115.)  It is disingenuous for Defendants to accuse Plaintiffs' counsel for failure to comply with Rule 26 when they have not done so either.

### c)  Extent of the Review of the Privileged Information

Again, there is no evidence that the forwarded emails contained any labels indicating they were privileged, and there is no evidence that counsel reviewed or accessed that information after being notified of Defendants' assertion of privilege.  Again, there was no review of the Outlook inbox produced in its entirety.

### d)  Significance of the Privileged Information

As Defendants failed to produce unredacted copies of the purportedly privileged emails, there is no way for the Court to know whether the information contained in these emails are relevant to Plaintiffs' claims and evaluate the significance of any privileged information, let alone Defendants' assertions that "the record reflects that Houser already used the misappropriated privileged communications to litigate this case."  (Doc. No. 70 at 6.)

### e)  Fault of the Movant

While it is true that, like the case in *Richards*, Houser signed a non-disclosure agreement and was a high-level executive with "frequent communications" with outside counsel, unlike *Richards*, the material did not bear prominent labels that the information was privileged and/or confidential.  168 F. Supp. 2d at 1205, 1208.  While Houser testified he did not think the PIIA applied to emails, he also testified that nothing in the definition of "Proprietary Information" in the PIIA excluded emails.  (Doc. No. 64 at 64, 79-80.)

### f)  Prejudice to the Non-Movant

---

[9] However, the Court subsequently admitted the "to" and "from" portion of the exhibits for purposes of the hearing as it was the only unredacted portion.  (Doc. No. 64 at 83, 166.)

This case was filed just shy of two years ago, with a discovery deadline of April 17, 2023 and a pending motion by Defendants for partial summary judgment.  Therefore, it may be difficult for Plaintiffs to obtain new counsel at this stage in the litigation.  While Plaintiffs would be deprived of counsel of their choice, this case is like *Richards* in that Plaintiffs' actions by forwarding certain emails to counsel and downloading his Outlook inbox and sending it counsel resulted in the breach of privilege, and therefore the deprivation of counsel of their choice would not "weigh heavily against disqualification."  168 F. Supp. 2d at 1208.

Assuming, *arguendo*, that some of the emails at issue are in fact privileged, the balance of the six factors weighs in favor of denial of the motion to disqualify.  Therefore, the undersigned recommends as follows.  Since defense counsel during questioning of attorney Rosenthal admitted there may be items on the privilege log that should be removed (Doc. No. 64 at 93), Defendants are directed to promptly review and revise, if necessary, the privilege log at Doc. No. 41 and serve it on Plaintiffs.  Plaintiffs in turn shall promptly return any privileged communications identified on the log to Defendants.  In the event of any challenges to an attorney-client or work product designation, the parties shall identify the communication(s) at issue and Defendants shall submit the unredacted communication(s) to the Court for *in camera* review.  As to the inadvertently produced emails between Houser and his counsel that Defendants possess, Defendants shall promptly return the specified information.  In the event of any challenges to an attorney-client or work product designation, the parties shall identify the communication(s) at issue and Plaintiffs shall submit the unredacted communication(s) to the Court for *in camera* review.

While the crux of Defendants' motion for return of property and sanctions regarding the emails relates to privileged communications, there are also passing references in the motion to "proprietary and confidential" information contained in the emails in the Outlook inbox.  (Doc. No. 38.)  The undersigned

notes that there is a protective order in this case (Doc. No. 37), and Defendants make no argument as to designations that should have been made under the protective order or any violations of the protective order.  (Doc. No. 38, 44.)  At the hearing, during questioning of attorney Rosenthal, defense counsel directed Rosenthal to an exhibit where Rosenthal offered to treat the emails, including those that contain trade secrets or proprietary information, as attorneys-eyes only pursuant to the protective order.  (Doc. No. 64 at 91-92.)  While the undersigned agrees that is untenable for the privileged information, there is no reason why the emails that are not privileged but contain trade secrets or proprietary information cannot be designated as "attorneys' eyes only" under the protective order.  Therefore, Defendants shall identify the non-privileged emails it believes contain trade secrets and/or proprietary information that shall be designated "attorneys' eyes only" under the protective order, and Plaintiffs shall mark the information accordingly and handle such material as required under the terms of the protective order.

All parties are precluded from using the privileged information.

### III.    CONCLUSION

For the foregoing reasons, the undersigned recommends the Motion for Return of Property and Sanctions be GRANTED IN PART and DENIED IN PART as set forth in this Report & Recommendation.

Date:  April 17, 2023

      *s/ Jonathan Greenberg*
      Jonathan D. Greenberg
      United States Magistrate Judge

### OBJECTIONS

**Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this document.  Failure to file objections within the specified time may forfeit the right to appeal the District Court's order.  *Berkshire v. Beauvais*, 928 F.3d 520, 530-31 (6th Cir. 2019).**